## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANDREA STRAUB**<br><br>     **v.**<br><br>**CBS BROADCASTING, INC.** | **CIVIL ACTION**<br><br>**NO.  14-5634** |

### MEMORANDUM RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Baylson, J.**                                                    **March 11, 2016**

## I.  Introduction

Plaintiff Andrea Straub has sued Defendant CBS Broadcasting for defamation (Count I), false light (Count II), and intentional infliction of emotional distress (Count III).  Her suit stems from broadcasts on June 26 and 27, 2013 covering the fact that Plaintiff and her then-husband, Jonathan Straub, had been charged with harassment and disorderly conduct as a result of certain occurrences at the home of their next door neighbor, Mary Catherine Martell.

Specifically, Plaintiff avers that Defendant defamed her when it claimed it had "exclusive surveillance video" of Plaintiff caught "in the act" of placing dead mice and snakes on Ms. Martell's front lawn as part of a campaign of "home sale sabotage."  Defendant has moved for summary judgment on grounds that Plaintiff's claims are barred by the fair report privilege, that Plaintiff cannot establish that Defendant acted negligently or with actual malice, and that Plaintiff fails to allege intentional infliction of emotional distress as a matter of law.

Although this is a very close case on the substantive claims, Defendant's Motion shall be denied for the reasons that follow.

## II.  Factual Background

### A.  Summary of Undisputed Facts

#### 1.  Police Cited Plaintiff and Her Husband for Harassment and Disorderly Conduct

Plaintiff and Jonathan Straub owned property located at 117 Booth Lane in Haverford, Pennsylvania.  Ms. Martell owned the house next door at 119 Booth Lane.  Plaintiff is a realtor. In June of 2013, both Booth Lane homes were listed for sale.  Plaintiff was the listing agent on her residence.  Ms. Martell's house was for sale by owner.

On June 20, 2013, Ms. Martell called the police to report vandalism of her property.  In response, Lower Merion Police Department ("LMPD") Patrol Officer Tami Rigby met with Ms. Martell and with Eric Welsch, a man who had been taking care of Ms. Martell's property while she was in a rehabilitation facility.  Officer Rigby then met with Plaintiff at Plaintiff's home.

Officer Rigby prepared an Incident Report dated June 20, 2013 about what she discovered.  ECF 31-2 Def. Ex. 1 at LMPD0011.  That same day, Officer Rigby issued citations to Jonathan Straub and Plaintiff for harassment and disorderly conduct.

#### 2.  The Lower Merion Police Held a Press Briefing Describing the Charges

On or about June 25, 2013,[1] LMPD Officer Joanne Pepitone held a weekly media briefing.  While there is no verbatim record of what Officer Pepitone said at this meeting, Officer Rigby's citations against Mr. and Mrs. Straub were among the topics discussed and Officer Pepitone used the incident report as it existed on June 25 as the sole basis for her comments.

The parties agree that two local publications (the Ardmore-Merion-Wynnewood Patch and the Main Line Times) ran articles dated June 25, 2013 reporting on the briefing written by

---

[1] Officer Pepitone testified on April 20, 2015 that she typically does press briefings on Monday mornings, meaning the briefing for the week of June 24 would have occurred on June 24.  ECF 31-3 Def. Ex. 10 (Apr. 20, 2015 Pepitone Dep.) at 6:14-16; 37:7-9.  Reporters who were present during the briefing, however, recall that it occurred on Tuesday, June 25.  Def.'s Statement of Undisputed Facts and Pl.'s Resp. ¶ 44 n.5.  Whether the briefing occurred on June 24 or 25 is immaterial.

2

reporters who were present.   ECF 31-7 Sunnergren Decl. Ex. A (Patch article); ECF 31-8 Ilgenfritz Decl. Ex. A (Times article).  The parties hotly dispute precisely what Officer Pepitone said and whether the Patch and Times articles accurately summarized her remarks, particularly because the articles contain allegations not present in Officer Rigby's report and because they relay facts that Officer Pepitone testified she would not have said.[2]

### 3. On June 26, 2013, CBS Became Aware of the Charges Against Plaintiff and Her Husband and Reporter Walt Hunter Proceeded to Investigate

Walt Hunter, a reporter working for Defendant, investigated the charges against Plaintiff over the course of several hours beginning around noon on June 26.  Defendant ran broadcasts that same day at 5 p.m., 6 p.m., and 11 p.m, and again the next morning (June 27).  As part of his investigation, Hunter interviewed Welsch and spoke briefly with Officer Pepitone.

As to Pepitone, the parties sharply dispute what happened during Hunter's interaction with her and what level of confirmation Hunter received about the facts alleged in the Patch article, as described infra.

As for Welsch, Hunter testified that Welsch told Hunter on June 26 that Welsch had video of someone leaving a dead snake and mice in Ms. Martell's driveway and that this video had already been given to the police.  ECF 31-3 Def. Ex. 11 (Feb. 3, 2015 Hunter Dep.) at 22:14-18.   Defendant concedes that both of these statements were false.   No video obtained from Welsch either before or after Defendant's broadcasts showed mice, snakes, or anyone throwing or leaving or placing dead animals anywhere, and Welsch turned over the video to authorities on June 29.  Hunter never asked to see the video of someone leaving a dead snake and mice in the

---

[2] The Patch article, for example, characterized the Straubs' alleged behavior as "an apparent attempt to sabotage the sale of their [neighbor's] Booth Lane home," a charge that does not appear in Officer Rigby's report.  Both the Patch and Times pieces also claim the police had video of the Straubs putting dead mice and snakes in Ms. Martell's driveway, even though the incident report only mentions alleged video of signs being knocked down and flyers being removed.  Both the Patch and Times articles additionally mention that Ms. Martell had been hospitalized, a fact that Officer Pepitone stated she would not have said because of Health Insurance Portability and Accountability Act ("HIPAA") privacy concerns.  ECF 31-3 Def. Ex. 10 (Apr. 20, 2015 Pepitone Dep.) at 8:8-11; 24:3-12; 40:5-13.

driveway.  Hunter also did not make any independent assessment of Welsch's credibility, believing instead that the police had determined that his allegations were credible by virtue of having issued the citations.

### 4. CBS Ran a Broadcast at 5 p.m. on June 26, and Plaintiff Reached Out in Response

The full transcript of Defendant's initial broadcast reads as follows (ECF 31-5 Def. Ex. 25) (emphasis added):

- *MR. MAY:* ***Dead mice and a dead snake thrown in the front lawn of a Main Line home***, *and police say that neighbors, real estate agents, are responsible for it. Some call it* ***home sale sabotage***. ***Eyewitness News obtaining exclusive surveillance video of the perpetrators in the act***. *Eyewitness News reporter Walt Hunter has more from the Haverford section of Lower Merion.*

- *MR. WELSCH: She's just trying to sell the home, wasn't doing anything wrong, and I just -- it just isn't right.*

- *MR. HUNTER: Eric Welsch says when the elderly owner of this home, where he's house sitting, first listed it for sale in April, strange things started happening. He found dead mice on two occasions on the driveway.*

- *MR. WELSCH: Once, I can say, oh, that's just a mouse dying, a cat, whatever. But two times? You know, something shady going on.*

- *MR. HUNTER: So Welsch says he set up surveillance cameras and, after spotting figures on the driveway, he then found a dead snake still stuck to a glue trap.*

- *MR. WELSCH: Throw it in your own trash bag, not hide it over here for an old woman to find.*

4

- *MR. HUNTER: Finally, the cameras captured someone walking up and trampling the sale sign onto the ground. __Welsch showed his videos to police__, and they issued citations to Jonathan and Andrea Straub, Main Line Realtors, who are selling the home directly next door. These identical citations for harassment and disorderly conduct accuse the two Realtors with annoyance by creating a physically offensive condition which serves no legitimate purpose. __While the citation does not specifically accuse the Straubs of leaving the mice, the snake, and knocking down the signs, they are fined $446 each__. Attempts to reach the Straubs at their real estate office and at their home and by phone were all not successful, __Welsch alleging that they were upset because the elderly resident chose to list her home next door on her own rather than using their services.__*

- *MR. WELSCH: There shouldn't be competition around here for house selling because they sell like hotcakes.*

- *MR. HUNTER: Finally, an attorney who represents the Straubs reached out to CBS 3, explaining that the Straubs are upstanding businesspeople of excellent character. He says there's much more to be found out about these allegations, and he says, perhaps here, the Straubs will be having more to say about it in the very near future. In Haverford, Walt Hunter, CBS 3, Eyewitness News.*

After the 5 p.m. broadcast, Plaintiff and Hunter had a phone conversation. The parties agree that Plaintiff told Hunter that Welsch had a criminal background and that Plaintiff denied Welsch's allegations. They also agree that Plaintiff mentioned Welsch's background as a horror film maker: Defendant suggests Plaintiff said that this fact alone made Welsch untrustworthy, while Plaintiff avers that Plaintiff brought it up to suggest that Welsch could have edited the

tapes Defendant purported to possess.  Plaintiff then declined Hunter's offer to be interviewed or to update the story with corrective comments.

### 5. CBS Ran Additional Broadcasts at 6 p.m. and 11 p.m. on June 26 and in the morning hours of June 27

At 6 p.m., Defendant ran its second broadcast.  ECF 31-5 Def. Ex. 25 (emphasis added). The transcript is similar to the 5 pm broadcast and reads as follows:

- *MR. MAY:* ___Home sale sabotage___*, that is the accusation being leveled at some Main Line real estate agents tonight.* ___They were accused of using some underhanded tactics; dead mice, even a dead snake___*.* ___Eyewitness News has obtained exclusive surveillance video of the perpetrators in the act.___ *Eyewitness News reporter Walt Hunter has more from the Haverford section of Lower Merion.*

- *MR. WELSCH: She's just trying to sell the home, wasn't doing anything wrong, and I just -- it just isn't right.*

- *MR. HUNTER: Eric Welsch, house sitter for the elderly woman trying to sell this home, says when he set up surveillance cameras, they captured a man knocking down the owner's For Sale sign.*

- *MR. WELSCH: They were saying the signs were tacky, that this is Haverford, and you can't do that kind of stuff in Haverford.*

- *MR. HUNTER: But as the cameras rolled, showing still more shadowy figures, he says things got worse, two dead mice found on the driveway.*

- *MR. WELSCH: Once, I can say, oh, that's just a mouse dying, a cat, whatever. But two times? You know, something shady going on.*

- *MR. HUNTER: Then, after seeing still more shadowy figures on video, a dead snake discovered in the bushes stuck to a glue trap.*

- *MR. WELSCH: Throw it in your own trash bag, not hide it over here for an old woman to find.*

- *MR. HUNTER: Police have now cited the couple selling the house next door, Realtors Jonathan and Andrea Straub, for disorderly conduct and harassment; the citations fining each of them $446.* ***Those citations do not mention the allegations involving the snake, the mice, or knocking down the sign, but they do claim, with intent to harass, annoy, or alarm the victim, they repeatedly committed acts which serve no legitimate purpose****. After attempting to contact the Straubs at their office and by phone, the couple's attorney reached out to CBS 3, emphasizing they were upstanding businesspeople with excellent characters respected in their communities;* ***Welsch, on the other hand, alleging it was the elderly owner's decision to market her own home that prompted the harassment****.*

- *MR. WELSCH: There shouldn't be competition around here for house selling because they sell like hotcakes.*

- *MR. HUNTER: Finally, the attorney for the Straubs says he has yet to see the video and that there's much more about these allegations that has not yet come to the surface. He says he hopes to be doing more to present their side of the story, a side proving they're innocent, in the very near future. In Haverford, Walt Hunter, CBS 3, Eyewitness News.*

Truncated versions of the story were broadcast at 11 p.m. that night at as part of the morning news on June 27.

**B.  Summary of Disputed Facts**

The most material issue presented is whether Defendant's broadcasts went beyond the information stated in Officer Rigby's citations or Officer Pepitone's press briefings.

**1.  Differences Between the Undisputed Contents of Officer Rigby's Incident Report and the Undisputed Contents of CBS Broadcasts**

The incident report does not mention video of snakes or mice; it only mentions video of a sign being repeatedly knocked over and flyers taken.  ECF 31-2 Def. Ex. 1 at LMPD0011.  Nor does it mention the Straubs placing dead mice or Plaintiff placing a dead snake on Ms. Martell's property, instead stating only that according to Welsch, Jonathan Straub admitted to placing the snake.  A jury could find that the 5 p.m. June 26, 2013 broadcast implied that CBS had exclusive footage of both Jonathan Straub and Plaintiff (the "perpetrators") engaged "in the act" of placing "dead mice and a dead snake thrown in the front lawn of a Main Line home."  A jury could similarly interpret the 6 p.m. broadcast to state that Defendant had video of "some Main Line real estate agents" (clarified in the broadcast as Plaintiff and Jonathan Straub) "using some underhanded tactics; dead mice, even a dead snake."

Additionally, the incident report does not mention that police had seen any of Welsch's video.  Police in fact did not obtain the video until June 29.  By contrast, the 5 p.m. June 26 broadcast states, "Welsch showed his videos to police and they issued citations to Jonathan and Andrea Straub," from which a jury could infer an implication that the decision to issue the citations was based on more than just Officer Rigby's interactions with Welsch and Plaintiff.

The incident report also does not mention any purported motive by Plaintiff or Jonathan Straub to retaliate against Ms. Martell for her refusal to list her property with Plaintiff, although it does note that Ms. Martell had her house for sale by owner and that Plaintiff is a realtor representing the sale of Plaintiff's home.  By contrast, the 5 p.m. broadcast began with a graphic

titled "Home Sale SABOTAGE," and those words appear in the broadcast transcript.  Defendant also presented the independent accusation by Welsch that Plaintiff and Mr. Straub "were upset because the elderly resident chose to list her home next door on her own rather than using their services."  The 6 p.m. broadcast also used the phrase "home sale sabotage" and similarly included Welsch's accusation.

Finally, the 5 p.m. and 6 p.m. broadcasts claimed that Defendant possessed "exclusive surveillance video of the perpetrators in the act."  Plaintiff argues that this statement is an independent assertion by Defendant that has nothing to do with the LMPD's charges.

### 2.   Purported Differences Between What Officer Pepitone Said at the LMPD Press Briefing and the Content of Defendant's Broadcasts

Defendant argues that Officer Pepitone lumped the Straubs together and said they were both caught on tape placing mice and snakes.  Plaintiff argues that Officer Pepitone repeatedly testified that she would not have strayed from the incident report, which makes no mention of Plaintiff placing dead animals anywhere, and that Pepitone would not have said Plaintiff was caught on tape doing such a thing.

Officer Pepitone obviously did not know at the time she made her statements that they would play a critical role in a future defamation action.  Unsurprisingly, she did not recall at her April 2015 deposition exactly what she said at a short and routine press briefing in June 2013.  ECF 31-3 Def. Ex. 10 (Apr. 20, 2015 Pepitone Dep.).  Officer Pepitone testified inconsistently on the issue of whether she stated that security cameras showed Plaintiff placing dead mice and snakes on the driveway,[3] though she was more definitive in saying she never would have characterized the incident as "home sale sabotage."

---

[3] Compare, e.g., ECF 31-3 Def. Ex. 10 (Apr. 20, 2015 Pepitone Dep.) at 25:25-26:3 ("Q. Do you recall stating in the press conference that the security cameras clearly showed the Straubs placing dead mice and snakes in the

As alluded to earlier, Defendant has offered the <u>Patch</u> and <u>Times</u> articles to suggest that Officer Pepitone went beyond Officer Rigby's incident report by both using words analogous to "sabotage" of a home sale and claiming the police possessed video showing Plaintiff on camera placing dead mice and snakes in her neighbor's driveway. Plaintiff contests the accuracy of these articles. Officer Pepitone testified that she had been misquoted in the <u>Patch</u> article, but at times implied the misquote only applied to a statement that Ms. Martell had been hospitalized or the fact that she, Pepitone, would not have used the word "clearly."

### 3.   What Happened When Hunter Spoke with Officer Pepitone on June 26

The parties agree that Officer Pepitone testified she had been instructed not to give Hunter any additional information, and that Hunter and Officer Pepitone nevertheless did have a brief conversation.

Hunter testified that he confirmed the allegations against the Straubs from Officer Pepitone, including the information printed in the <u>Patch</u> article (which he had with him), and that Pepitone told him the police had seen Welsch's video.

Pepitone, by contrast, testified that when Hunter presented the <u>Patch</u> article to her, she replied that she had been misquoted (without explaining how) and said nothing further. According to Officer Pepitone, Hunter did not ask what she meant. Pepitone added that she would not have told Hunter that police had seen video because Officer Rigby's report did not state that any video had been viewed.

### III. Procedural History

Plaintiff originally sued Defendant and its individual employees in the Philadelphia Court of Common Pleas on March 5, 2014. Plaintiff filed a second defamation action in state court

---

driveway? A. Yes.") <u>with</u> <u>id.</u> at 64:22-65:1 ("I did not specifically state she placed the dead animals because [the incident report] doesn't state that. And I did not see the video to state who did what.")

against Interstate General Media (owner of the <u>Daily News</u>), an IGM reporter, and Defendant on July 24, 2014.  By stipulation of the parties, Plaintiff agreed to dismiss Defendant from the IGM suit and to dismiss the individual defendants from this action.  The Court of Common pleas dismissed Defendant's individual employees on September 18, 2014.  ECF 1 (notice of removal).  Defendant then removed this case to federal court on October 1, 2014.

Defendant filed its Motion for Summary Judgment on November 12, 2015.  ECF 30.  Pursuant to a court ordered stipulation (ECF 33), Plaintiff filed her Opposition to Defendant's Motion on December 18 (ECF 40) and Defendant filed a Reply on January 8, 2016 (ECF 43).  The Court held oral argument on Defendant's Motion on February 11, 2016.  The parties submitted supplemental briefing on February 29 in response to the Court's request, and the Motion is now ripe for decision.

## IV. Analysis

### A.  Summary Judgment Standards

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  <u>Id.</u>  Under Rule 56, the Court must view the evidence presented in the light most favorable to the non-moving party.  <u>Id.</u> at 255.

### B.  The Fair Report Privilege Does Not Bar Plaintiff's Claims

#### 1.  Standards for Application of the Fair Report Privilege

"The fair report privilege . . . developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer."  Medico v. Time, Inc., 643 F.2d 134, 137 (3d Cir. 1981).  "To ameliorate the chilling effect on the reporting of newsworthy events . . . , the law has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements."  Id. "So long as the account presents a fair and accurate summary of the proceedings, . . . [t]he privilege . . . permits a newspaper or other press defendant to relieve itself of liability without establishing the truth of the substance of the statement reported."  Id. at 137-38.

As other district courts have noted, "the defendant bears the burden of establishing that the occasion upon which the defendant published the defamatory matter gives rise to a privilege."  Hudak v. Times Publ'g Co., Inc., 534 F. Supp. 2d 546, 560 (W.D. Pa. 2008) (citations omitted); see also 42 Pa. Stat. and Cons. Stat. Ann. § 8343 (West 2016).

"Once the existence of a privileged occasion is established, the burden then shifts to the plaintiff to establish an abuse of that privilege."  Hudak, 534 F. Supp. 2d at 560.  In applying New Jersey law, which rests upon the same section of the Restatement (Second) of Torts that Medico held governs Pennsylvania's fair report privilege, the Third Circuit noted that "[a] fair distillation of the standard [for abuse of the privilege] is this: Do the [official report or proceeding] and the article have equal 'sting'?"  Lavin v. N.Y. News, Inc., 757 F.2d 1416, 1419-20 (3d Cir. 1985).  "Whether the privilege has been abused or overcome is a factual question for the jury, but like any other factual inquiry, it may be ruled on by the court if the evidence is so clear that no reasonable person would determine the issue in any way but one."  Hudak, 534 F. Supp. 2d at 560 (citations omitted).

12

As explained below, applying the fair report privilege to a broadcast is not an all or nothing proposition.  In this case, some portions of Defendant's statements were reports of police activity while others reflect independent assertions that have no basis in what the LMPD said.

### 2.  The Privilege Does Not Apply to Defendant's Independent Assertion that It Possessed Video of Plaintiff "In the Act"

As noted above, Defendant's 5 p.m. and 6 p.m. broadcasts on June 26 both claimed that Defendant had "obtained exclusive surveillance video of the perpetrators in the act."  As to this claim, Defendant has failed to carry its burden of demonstrating as a matter of law that the fair report privilege applies at all.  See Weber v. Lancaster Newspapers, Inc., 878 A.2d 63, 78 (Pa. Super. 2005) ("Weber argues that the articles falsely stated that Smeltz provided information to the press. This allegation has nothing to do with the contents of the PFA, or paraphrasing the PFA . . . . Thus, the fair report privilege does not apply to this allegation.").

Defendant's assertion that it possessed video is not a report of any official proceeding.  It is instead an independent factual allegation, ungrounded in the incident report or Officer Pepitone's press briefing.  Therefore, no privilege can attach to a substantial portion of what Plaintiff characterizes as the defamatory sting of Defendant's broadcasts.

### 3.  The Fair Report Privilege Could Protect Defendant's Account of the Press Briefing Even Though Defendant Did Not Personally Attend

Plaintiff conceded at the February 11 hearing that if Defendant had merely broadcast a story covering Officer Pepitone's repetition of Officer Rigby's incident report, the fair report privilege would attach.

The Court agrees.  A media account of an oral police briefing is clearly a report of official police activity.  See McMillian v. Phila. Newspapers, Inc., No. CIV.A. 99-2949, 2001 WL 267867, at *4-5 (E.D. Pa. Mar. 15, 2001) (statement of police spokesperson covered by fair

report privilege). This is so even though Defendant only came to hear of the LMPD's allegations second hand.  See Medico, 643 F.2d at 147 (citations omitted) ("How a reporter gathers his information concerning a judicial proceeding is immaterial provided his story is a fair and substantially accurate portrayal of the events in question."); Medure v. Vindicator Printing Co., 273 F. Supp. 2d 588, 617 (W.D. Pa. 2002) ("[A] media defendant need not actually have seen and relied upon reports of official proceedings so long as the story is a fair and accurate portrayal of the events in question.").

Therefore, as to elements of the broadcast that repeat the LMPD's accusations against Plaintiff (as opposed to Defendant's own claim to possess certain exclusive video), Defendant has met its burden of showing applicability of the fair report privilege.

### 4. Genuine Issues of Material Fact Preclude Granting Partial Summary Judgment on the Basis of the Fair Report Privilege

In this case, as flagged above, there are numerous factual issues that go directly to the question of whether Defendant abused the fair report privilege.

Most notably, the record is unclear as to exactly what the "official report" is in this case. Although the contents of Officer Rigby's incident report are undisputed, there is no verbatim record of Officer Pepitone's press briefing, Officer Pepitone's testimony as to what she said is inconsistent, and there is a dispute as to whether Hunter confirmed the details of the Patch article covering the briefing.  This case is therefore distinguishable from others cited by Defendant in which the underlying statements by law enforcement were not in dispute.  See Hudak, 534 F. Supp. 2d at 572 (reporter directly recorded prosecutor's statements).

Defendant certainly has several compelling arguments that portions of its broadcast did not materially stray beyond the bounds of Officer Pepitone's briefing.  The fact that the Patch and Times articles included details not present in Officer Rigby's report, such as the phrase

14

"sabotage," suggests that Officer Pepitone may not have hewed entirely to that document. Defendant also notes that in a November 2013 Tort Claim Notice against Lower Merion Township, Plaintiff's own former counsel characterized the press briefing as having included accusations of "littering [a neighbor's for-sale property] with dead vermin."  ECF 43-3 Second Sproul Decl. Ex. 37.

Until the factual disputes in this case have been resolved, however, it is impossible to determine if abuse of the fair report privilege occurred.  Accordingly, summary judgment for Defendant on the basis of that privilege is inappropriate.

**C. Count I (Defamation) Survives Summary Judgment**

**1. Because Plaintiff is a Private Figure and the Matter is One of Private Concern, Plaintiff Must Prove Defendant was Negligent to Prevail**

In defamation actions under Pennsylvania law, "in order to recover damages, the plaintiff must demonstrate that the statement results from fault, amounting at least to negligence, on the part of the defendant."  U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 923 (3d Cir. 1990).

Pursuant to the First Amendment, "[w]hen [a defamation] plaintiff is a public official or a 'public figure' and the speech is of public concern, [the plaintiff] must prove by clear and convincing evidence that the defamatory falsehood was made with 'actual malice' by a media defendant [and also] prove the falsity of the statements to prevail."  Id. at 929 (citations omitted). Actual malice, of course, means the defendant made the statement with knowledge of its falsity or reckless disregard for whether it was true or false.  Id. at 927.  "When the plaintiff is a private figure but the speech involves a matter of 'public concern,' the states may define for themselves the appropriate standard of liability; however, they may not impose liability without fault" and the plaintiff must similarly prove falsity.  Id. at 929 (citations omitted).

In this case, there is no indication that Plaintiff was a public figure before the LMPD's citations "went viral" (ECF 1 Compl. ¶ 51).  Nor does Plaintiff's alleged vandalism of her neighbor's home qualify as a matter of public concern.  See Marcone v. Penthouse Int'l Magazine For Men, 754 F.2d 1072, 1083 (3d Cir. 1985) (citations omitted) ("[A] public controversy must be a real dispute, the outcome of which affects the general public or some segment of it.  To be 'public,' the dispute must affect more than its immediate participants.").

Accordingly, to prevail on her defamation claim Plaintiff will have to show that Defendant was negligent in publishing defamatory material.

**2.   Whether Defendant Was Negligent is a Question of Fact**

To prove that Defendant was negligent, Plaintiff must show that Defendant "failed to investigate the truth of the claims [it] published."  See Ruder v. Pequea Valley Sch. Dist., 790 F. Supp. 2d 377, 400 (E.D. Pa. 2011).  See also Pacitti v. Durr, No. 08-2105, 310 F. App'x 526, 528 (3d Cir. Feb. 11, 2009)(unpublished) ("Negligence in this context is the publication of information with a want of reasonable care to ascertain the truth.").

One key dispute concerns how to interpret Defendant's claim that it possessed "exclusive surveillance video of the perpetrators in the act."  Plaintiff urges that when coupled with remarks about dead mice and snakes, the phrase "in the act" implies that Defendant possessed video of Plaintiff engaged in such behavior.  It is undisputed that Defendant does not now, nor has it ever, possessed such video.  If Plaintiff's interpretation carries the day before the jury, Plaintiff may be able to establish not only negligence but also actual malice (as discussed below).

Additional factual questions also exist regarding the sufficiency of Defendant's diligence before running its broadcasts.  Most notably, Plaintiff and Defendant dispute whether Hunter confirmed the details of the police briefing, as reported in the Patch article, with Officer

Pepitone.  Furthermore, Hunter admittedly did not independently assess Welsch's credibility or ask Welsch to produce videos Welsch claimed to have even though Defendant concedes that Welsch twice lied to Hunter (once about possessing video that Welsch did not actually have, and again in claiming on June 26 to have given the police video that was not turned over until June 29).  As to the 6 p.m. broadcast, Defendant continued to run Welsch's allegations despite Plaintiff's contention that in her conversation with Hunter, she raised the possibility that Welsch could have doctored his video based on his expertise as a horror film maker.

Accordingly, the Court will deny summary judgment as to Count I.

### D.  Count II (False Light) Survives Summary Judgment Because Factual Disputes Exist Regarding Whether Defendant Acted with Actual Malice

"Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who publishes material that is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity."  Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) (citations omitted).[4]  As other courts have noted, "false light invasion of privacy claims incorporate the same First Amendment protections as claims for defamation under state law" and

---

[4] Plaintiff argues that actual malice is not required to make out a false light claim.  ECF 40-1 at 51 n.36.  Plaintiff cites a Third Circuit precedent that at first glance appears to omit the requirement that the statement be made with knowledge of or reckless disregard for falsity.  See Smith v. Borough of Dunmore, 633 F.3d 176, 182 (3d Cir. 2011).  Smith, however, appears to be quoting the plaintiff's brief rather than pronouncing on the law.  See id. ("Smith's claim that the public's interest in the information is not relevant to his false light claim has no grounding in Pennsylvania law, a fact demonstrated elsewhere in his own brief by his citation of Strickland v. Univ. of Scranton, 700 A.2d 979 (Pa.Super.1997), for the elements of a false light claim: '(1) publicity, (2) given to private facts, (3) which could be highly offensive to a reasonable person, and (4) which are not of legitimate concern to the public.'").  Even assuming that Smith at one time did state the standard for false light claims, it has since been abrogated by more recent Third Circuit authority.  Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) clearly held that actual malice is always required to recover for false light.  The Court believes the confusion stems from the fact that Smith (and Plaintiff's other cite, see Rush v. Phila. Newspapers, Inc., 732 A.2d 648, 654 (Pa. Super. 1999)) cites to Strickland v. University of Scranton, 700 A.2d 979, 987 (Pa. Super. 1997) for these factors, which in turn cites to Harris by Harris v. Easton Publ'g Co., 483 A.2d 1377, 1384 (Pa. Super. 1984), a case dealing with the tort of "publicity given to private life" (as specifically distinguished from false light).  Plaintiff also cites to dicta in a 1980 Pennsylvania Supreme Court case stating that malice is required in false light cases "where the published matter is in the public interest," see Commonwealth v. Hayes, 414 A.2d 318 n.18 (Pa. 1980), but this dicta cannot overrule the Third Circuit's binding pronouncement in Graboff that actual malice is always required.

case law from defamation actions involving actual malice is informative of that standard in the false light context.  See Taha v. Bucks Cty., CIVIL ACTION NO. 12-6867, 2015 WL 9489586, at *3 (E.D. Pa. Dec. 30, 2015).

For purposes of this Motion, Defendant has not argued the first two elements of false light.  Instead, Defendant posits that its broadcasts were not made with actual malice, i.e. with reckless disregard for truth or falsity or with knowledge of falsity.

As with Defendant's argument that it was not negligent, however, genuine issues of material fact preclude granting summary judgment.

Most notably, to the extent the jury concludes that Defendant's broadcast claimed that Defendant possessed exclusive video of Plaintiff "in the act" of throwing dead mice and snakes on her neighbor's property, no such video exists.  Defendant may have either known or recklessly disregarded the fact that that assertion was false in claiming otherwise.

Defendant and Plaintiff also vigorously contest whether Hunter confirmed the details of the Patch article with Officer Pepitone before running the story.  If Hunter added references to Plaintiff in his broadcast that the police did not make in their briefing, that would bear on actual malice.  See Curran v. Phila. Newspapers, Inc., 439 A.2d 652, 661-62 (Pa. 1981) (embellishment of an official's remarks to include a reference to plaintiff when the official did not make one presents a jury question on the issue of actual malice).  See also Moore v. Vislosky, Nos. 06-1232, 06-1304, 240 F. App'x 457, 467 (3d Cir. Apr. 23, 2007)(unpublished) ("Even under the meaningful appellate review given to a finding of actual malice under New York Times, it is within the province of the jury to credit the testimony of one witness over another.").

Finally, it is undisputed that Hunter relied on Welsch without independently assessing Welsch's credibility, even though Welsch had demonstrably lied about both possessing certain

video and having turned it over to the police.  The Supreme Court has held that similar behavior

can support an inference of actual malice.  See Harte-Hanks Commc'n, Inc. v. Connaughton, 491

U.S. 657, 688 (1989) (citations omitted) ("In a case such as this involving the reporting of a third

party's allegations, recklessness may be found where there are obvious reasons to doubt the

veracity of the informant or the accuracy of his reports.").

Accordingly, the Court will deny summary judgment as to Count II.

**E.  Count III (Intentional Infliction of Emotional Distress), Although Extremely Tenuous, Survives for Now**

"The gravamen of the tort of intentional infliction of emotional distress is that the

conduct complained of must be of an 'extreme or outrageous type.'  As a preliminary matter, it is

for the court to determine if the defendant's conduct is so extreme as to permit recovery."  Cox v.

Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988) (citations omitted).

The Court is extremely dubious of Plaintiff's purported claim for intentional infliction of

emotional distress.  Plaintiff cannot cite a single case holding that Defendant's alleged conduct

qualifies as outrageous enough to state such a claim, and the Third Circuit has rejected the

application of intentional infliction of emotional distress in a case in which the defendants

"show[ed] disparaging reports in public" about plaintiff (among other actions).  Clark v. Twp. of

Falls, 890 F.2d 611, 624 (3d Cir. 1989).

Nevertheless, because summary judgment has already been denied as to Counts I and II,

the Court will deny it as to Count III.  Defendant may renew its argument for judgment as a

matter of law before the conclusion of trial pursuant to the Federal Rules of Civil Procedure, see

Fed. R. Civ. P. 50.

**V. Conclusion**

The Court is mindful of the Third Circuit's admonition that "[f]reedom of expression is paramount in a democratic society."  Hart v. Elec. Arts, Inc., 717 F.3d 141, 149 (3d Cir. 2013). Nevertheless, the First Amendment does not provide immunity for defamation and related torts, and the factual disputes present in this close case preclude granting Defendant's Motion.

An appropriate Order follows.

O:\CIVIL 14\14-5634 straub v. cbs broadcasting\14cv5634 MSJ Opinion (draft).docx