IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANDREA STRAUB** | : |
| | : |
| **Plaintiff,** | : |
| | : Civ. Action No. 14-cv-5634-MMB |
| v. | : |
| | : |
| **CBS BROADCASTING INC.,** | : |
| | : |
| **Defendant.** | : |
| | : |

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* NO. 4 OF
DEFENDANT CBS3 TO PRECLUDE REFERENCES TO
<u>GUIDELINES OF OTHER NEWS ORGANIZATIONS</u>**

Defendant CBS Broadcasting Inc. ("CBS3"), by and through its undersigned counsel, Levine Sullivan Koch & Schulz, LLP, respectfully moves this Court, *in limine*, to preclude references to journalistic standards promulgated by other news organizations. In support of this motion, CBS3 avers as follows:

Plaintiff and her expert Christopher Harper contend that two different sets of written standards should be applied to CBS3's conduct in this case: those of the Society of Professional Journalists ("SPJ") and the Radio Television Digital News Association ("RTDNA"). *See* plaintiff's trial exhibit 76 (Harper Expert Report, attached hereto as Exhibit 7); *see also* Exs. 1-2 (copies of SPJ and RTDNA codes).

Mr. Harper, a Professor of Journalism at Temple University's School of Media and Communication, had his videotaped trial deposition taken by both parties on Friday, April 8, 2016. During his testimony, which CBS3 understands plaintiff intends to offer at trial, Mr.

Harper purported to opine that CBS3 violated these two sets of guidelines, even going so far as to state that the guidelines themselves were intended to create a legal standard of care:

> These are – these are – are standards that are – that have been looked at by a variety of professional journalists and academics with the Society of Professional Journalists, for example. Their first code of ethics came out when they were known as sigma delta chi in 1926. They've been updated repeatedly. When it comes to the Radio, Television and Digital News Association, again, professionals, academics come together and -- and essentially hash out a lot of things on -- *on what should be ethical, what should be legal, what should be news* -- you know, generally accepted newsroom standards and practices, so I applied these, and there are other ethical standards as well, but these are particularly applicable to this case.

Harper Trial Testimony ("Harper Trial Test.") at 45:9-46:3 (emphasis added); *see also id*. at 40:19-22, 118:15-23, 139:18-140:7 (similarly referencing the purported application of these guidelines) (Harper Trial Test. attached hereto as Ex. 3); Ex. 7 at 15 ("CBS and the defendants failed to abide by generally accepted newsroom standard and practice as outlined in the SPJ code . . . .").

To begin with, as a predicate to the use of purported industry standards, there must first be a finding that these standards are in fact relied upon generally throughout the industry. *See, e.g.*, *Sawyer v. Dreis & Krump Mfg. Co.*, 493 N.E.2d 920, 925 (N.Y. Ct. App. 1986) (published industry standards are only admissible where there is a prior finding that standards represent "the general custom or usage in the industry"). *See also Iacangelo v. Georgetown Univ.*, 560 F. Supp. 2d 53, 59 (D.D.C. 2008) (excluding testimony on the "'National Standard of Care' applicable to attorney advisors who provide hospitals with legal advice" where plaintiff provided no support for the imposition of such a standard). This rule applies in the journalistic context as much as in any other. *See Kendrick v. Fox Television*, 659 A.2d 814, 823 (D.C. 1995) (declining to consider

2

journalistic ethics codes in applying negligence standard where there was no evidence that standards represented the general customs of the journalistic industry).

Here, the standards on which plaintiff and her expert rely are not, and do not purport to be, binding throughout the profession, or on CBS3 in particular. Indeed, neither Mr. Harper's expert report nor his trial testimony demonstrate that media organizations adhere to the so-called "industry" guidelines he espouses. And, regardless, the evidentiary record demonstrates that CBS3 is not bound by such guidelines. *See* W. Hunter Dep. at 34:18-20 ("Q. Are you a member of the Society of Professional Journalists? A. No.") (Exhibit 4 hereto); C. May Dep. at 58:3-8 ("Q. Are you a member of the Society of Professional Journalists? A. Am I a member, I am not. Are you a member of any professional societies? A. I am not.") (Exhibit 5 hereto).

Indeed, journalism is not and has never been a profession, such as medicine, law or accounting, that is subject to uniform governing standards, binding on all members of the profession, regardless of whether the standards have been voluntarily adopted or not. As one commentator has aptly observed:

> Responsible publishers do not have the generally recognized standards normally associated with traditional, learned professions. They possess no equivalent of generally accepted accounting principles, the Financial Accounting Standards Board statements, the American Institute of Architects' standards, or a Code of Professional Responsibility.
>
> Furthermore, I doubt that universal standards could be adopted by the press. Aside from the constitutional problems inherent in adopting even self-imposed rules of professional conduct for journalists, nothing suggests that the profession could reach a consensus on the issue.

Diana M. Daniels, *Public Figures Revisited*, 25 WM. & MARY L. REV. 957, 959 (1984), *quoted approvingly in* Rodney A. Smolla, 1 LAW OF DEFAMATION § 3:90 (2d Ed. 2011).

In fact, the "Code of Ethics" promulgated by the SPJ, on which plaintiff principally relies, specifically *disclaims* any aspiration to be generally binding on news organizations in the manner plaintiff envisions. The Code states on its face: "The SPJ Code of Ethics is *voluntarily embraced by thousands . . . and is intended not as a set of 'rules'* but as a resource for ethical decision-making. *It is not – nor can it be under the First Amendment – legally enforceable*." Ex. 1 (emphasis added). As one scholar has explained, this language was added to the Code specifically to "*disclaim its use as a standard for liability*." Amy Gajda, *Judging Journalism: The Turn Toward Privacy and Judicial Regulation of the Press*, 97 CAL. L. REV. 1039, 1043 (2009) (emphasis added). *See also id.* at 1043 n.23 (summarizing an email from Andy Schotz, Chair of the SPJ Ethics Committee, that stated that this language "was inserted to make clear to the public, including judges, . . . that code provisions were not mandatory and entirely voluntary"); *id.* at 1085 n.282 (describing the remarks of Steve Geimann, former president of the SPJ, to an audience of journalism educators to the effect that the Code was "intended to be only 'aspirational and inspirational,' not mandatory") (citation omitted).[1]

Moreover, even apart from whether the standards cited by plaintiff and her expert were meant to be generally binding, those standards were certainly not intended to function in the manner suggested by Mr. Harper – as providing hard-and-fast rules for establishing liability.

As an example, the SPJ website answers the question, "Why doesn't SPJ enforce its Code of Ethics?" this way:

> Nor could any set of rules, however detailed, possibly apply to all the nuances and ambiguities of legitimate expression. Rather, we are committed to encouraging the profession and the public to evaluate all reporting and reportage in ethical terms, not to apply

---

[1] As recently as last month, the current president of the SPJ again reiterated that "[t]he ethics code is not intended as a legal standard." Peter Sterne, *Journalism group responds to invocation of its ethics code in Hogan v. Gawker*, POLITICO (March 10, 2016).

> 'rules.' We believe our code provides the guidelines to make that possible. . . .
>
> So the Society has long felt that the best enforcement is in publicizing, explaining and applying those principles and weighing alternatives, as individuals, as journalists, and as an organization, in the form of comment and opinion, *without issuing definitive, quasi-legal judgments that might be put to improper use*.

Ex. 6 (emphasis added). The "Code of Ethics and Professional Conduct" for the RTDNA similarly states that the Association "does not dictate what journalists should do in every ethical predicament; rather it offers resources to help journalists make better ethical decisions – on and off the job – for themselves and for the communities they serve." Ex. 2. Again, these standards do not even purport to function as binding rules applicable in all situations and across all brands of journalism. *See Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 90 (D.D.C. 2012) (excluding expert testimony predicated in part upon SPJ Code because the code itself disclaims intent to operate as "a set of rules" or "universal mandate").[2]

At bottom, the standards on which plaintiff relies (1) have *not* been adopted by CBS3, (2) do *not* aspire to govern the journalistic industry generally, and (3) do *not* purport to function as hard-and-fast rules for fixing liability. Accordingly, it is inappropriate to use those standards at trial as a basis for determining whether CBS3's conduct failed to comport with the applicable standard of care.

For the foregoing reasons, CBS3 respectfully requests that the Court enter an order to preclude references to journalistic standards promulgated by other news organizations.

---

[2] If admitted at trial, there would inevitably need to be a "trial within a trial" on the adoption, meaning and application of these standards from witnesses with personal knowledge of the standards themselves, *i.e.*, from the organizations which promulgated them. Plaintiff's expert should not be heard to opine, for example, that the SPJ or RTDNA guidelines should govern the conduct of CBS3 when the organizations themselves have disclaimed any such application.

Dated: April 29, 2016

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By: */s/ Gayle C. Sproul*

Gayle C. Sproul (GCS8092)
Michael D. Sullivan (admitted *pro hac vice*)
Mara J. Gassmann (admitted *pro hac vice*)
1760 Market Street, Suite 1001
Philadelphia, PA 19103
Tel: (215) 988-9778
Fax: (215) 988-9750
gsproul@lskslaw.com

*Attorneys for Defendant CBS Broadcasting Inc.*