# EXHIBIT 7

to the

MOTION *IN LIMINE* NO. 4 OF DEFENDANT CBS3 TO PRECLUDE
REFERENCES TO GUIDELINES OF OTHER NEWS ORGANIZATIONS

August 10, 2015

James E. Beasley, Jr., Esq.
1125 Walnut Street
Philadelphia, PA 19107
Re: Andrea Straub vs. CBS Broadcasting, Inc., et. al.
U.S. District Court for the Eastern District of Pennsylvania

Dear Mr. Beasley:

I am submitting this expert report on generally accepted newsroom standards and practices at your request.

At the outset my credentials as an expert witness include experience in the news industry for more than 20 years at a variety of organizations, including The Associated Press, *Newsweek,* ABC News, and ABC *20/20.* I have been recognized by several Pennsylvania courts as an expert witness and have lectured on legal and ethical issues in undergraduate and graduate courses at Temple University, New York University, and Ithaca College for more than 20 years.

I have reviewed the following materials as a basis for my expert opinion:

1. The Complaint
2. Deposition transcript of Jeff Carns
3. Deposition transcript of Walter Hunter
4. Deposition transcript of Lesley Van Arsdall
5. Deposition transcript of John Wilson
6. Deposition transcript of Chris May
7. DVDs of various broadcasts on June 26-27, 2013, and December 11, 2013
8. Ethics code of the Society of Professional Journalists (1996 version)
9. Ethics code of the Radio, Television, Digital News Association
10. The Pennsylvania Defamation Statute

After reviewing these materials, it is my expert opinion that the defendants repeatedly and knowingly violated generally accepted newsroom standards and practices in reporting and broadcasting the stories about Andrea Straub.

On June 26 and June 27, 2013, CBS aired several reports about Ms. Straub. I will look at various parts of the broadcasts starting at 5 p.m., 6 p.m., and 11 p.m.

The opening material, generally referred to as a "lead-in," for the 5 p.m. broadcast stated the following:

> Dead mice and a dead snake thrown in the front law of a Main Line home, and police say the neighbors, real estate agents, are responsible for it [sic]. Some call it home sale sabotage. Eyewitness News obtained exclusive surveillance video of the perpetrators in the act. Eyewitness News reporter Walt Hunter has more from the Haverford section of Lower Merion.

The lead-in material, including the mention of exclusive video, written by Jeff Carns, approved by Walt Hunter, and in both cases was read by anchor Chris May, for the 6 p.m. broadcast was similar:

> Home sale sabotage, that is the accusation being leveled at some Main Line real estate agents tonight. They were accused of using some underhanded tactics: dead mice, even a dead snake. Eyewitness News has obtained exclusive surveillance video of the perpetrators in the act. Eyewitness News reporter Walt Hunter has more from the Haverford section of Lower Merion.

In what is known as a voice-over sound-on-tape, or VOSOT, during the 11 p.m. broadcast on the same date, Mr. May stated: "Well, some neighbors on the Main Line are accused of a home sale sabotage."

What is troubling about this lead-in is that Mr. Carns knew, even before the 5 p.m. broadcast, that this story was fundamentally flawed. In his deposition he testified that he knew this story was likely to lead to litigation, and he further admitted that he hadn't fully considered the content of the story.

```
                           30
         8  Q. Do you recall any discussions you had
         9     with Jennifer Druding about this story?
        10  A. Yes.
        11  Q. What is it you recall speaking with her
        12     about?
        13  A. I recall that I thought it was
        14     potentially litigious and that we could perhaps
        15     run into trouble legally with the story.

                           31
         6  Q. Was there anything about the content of
         7     the story that you felt in and of itself was
         8     potentially litigious?
         9  A. Not necessarily because I really didn't
        10     have the chance to delve into the content and I
        11     hadn't been working with the story all day. My
        12     contact with it was much more under a shorter time
        13     frame.
        14  Q. As you were watching the story who did
        15     you believe may end up being upset enough to file
        16     a lawsuit?
        17  A. The people that were the focus of the
        18     story, the Straubs.
```

> 34
> 5  Q. When you're speaking with Ms. Druding
> 6     about the potential litigation issues, did you say
> 7     something to the effect of, geez, we're going to
> 8     get sued for this, or was it different?
> 9  A. I would say that's a -- it's to that
> 10    effect, yes.
> 11 Q. Do you recall about what time of day it
> 12    was that that discussion occurred?
> 13 A. It was probably sometime between 4:30
> 14    and 5:00.

It is apparent to me that this story, with very limited, conflicting, and suspect facts, with a very questionable source, was rushed solely to have an "exclusive" broadcast and not for any legitimate newsgathering purposes. As Mr. Carns described, an exclusive is viewed as a way to have a competitive advantage over other news organizations:

> 37
> 18 Q. What, if anything, is the significance
> 19    of having an exclusive story?
> 20 A. There are some people who think that
> 21    it's strong from a branding perspective and gives
> 22    us a competitive advantage as a news organization.

When questioned about the source of the material for the story, both Mr. Hunter and Mr. Carns acknowledged that the very direct claims were not supported by the exclusive video they saw or the claims made by the neighbor. For example, Mr. Carns stated the following:

> 17
> 18 Q. Do you recall seeing any dead mice in
> 19    the video?
> 20 A. No.
> 21 Q. Do you recall seeing, not in terms of
> 22    what Mr. Hunter had filmed but in the videos
> 23    themselves from Mr. Welsch, do you recall seeing
> 24    any dead snakes in the video?
> 18
> 1  A. No.
> 2  Q. When you were looking at the video, was
> 3     it clear to you or was it grainy? Give us a
> 4     description of the quality of the video?
> 5  A. It looks like surveillance video.

```
 6  Q. Okay. But is it-- I mean, I've seen
 7     surveillance video that looks pretty good and I've
 8     seen some that looks bad. Could you give us, if
 9     you can, your interpretation of the quality of
10     this video?
11  A. I would say it looks like average
12     surveillance video.
13  Q. Were you able to pick out anybody's
14     faces, for example?
15  A. No.
16  Q. Were you able to distinguish, say, a
17     male between a female?
18  A. I don't recall the nature of the video.
19     I would have to see it again to see if I could.
```

                                19
```
13  Q. Did anybody, when you were looking at
14     the videos obtained by Mr. Hunter and his crew
15     from Eric Welsch, not the videos they filmed, did
16     anybody sit down with you and say, hey, here are
17     the Straubs plural in this video?
18  A. I don't recall.
19  Q. If we go to -- well, strike that.
20     If we look at -- let's just go to
21     Line 2. It says dead mice and a dead snake, going
22     on to Line 3, thrown on the front lawn of a Main
23     Line home. There's a comma and we'll stop there.
24     On this surveillance video that you
```
                                20
```
 1     saw did you see any animals at all on the front
 2     lawn of a Main Line home?
 3  A. No.
 4  Q. Did you ever speak with any of the
 5     police which said that the neighbors, the real
 6     estate agents, were responsible for it?
 7  A. No.
 8  Q. Did you see any communications other
 9     than press releases, did you ever see any notes,
10     e-mails, anything like that, from anybody at
11     Lower Merion Township Police Department that said
12     that the neighbors, the real estate agents, are
13     responsible for the dead mice and the dead snake
```

```
14      on the front lawn?
15  A.  No.
16  Q.  Who -- on Line 5 there's a sentence
17      that says some call it home-sale sabotage.  Who
18      are the some that you're referencing?
19  A.  Some people who had knowledge of the
20      story.
21  Q.  Who was that?
22  A.  Some people in the neighborhood.
23  Q.  But who are the people?
24  A.  I don't know.
```

21

```
1  Q. Did you ever speak with anybody in the
2     neighborhood?
3  A. No.
```

Mr. Hunter's collection of information and creation of this story also fell far below journalistic standards and practices. Although he testified that he spent five to 10 minutes speaking with Officer Joann Pepitone of the Lower Merion Police Department that there was surveillance video showing Ms. Straub dropping dead mice and snakes on the property, he admitted that, when actually viewing the videos, no such recordings were evident and in fact he didn't even ask Mr. Welsch to show him the video supporting the conclusions that Ms. Straub had placed dead animals in the driveways.

24

```
24  Q.  Okay. Did he [Eric Welsch] ever show you any video of
```

25

```
1       Andrea Straub placing any animals, alive or dead,
2       anywhere?
3   A.  I don't recall seeing any video of
4        Andrea Straub placing any dead animals anywhere.
5   Q.  Subsequent to June 26, 2013, have you
6        ever seen a video, from any source, of Andrea Straub
7        placing any animals, alive or dead, anywhere within
8        the vicinity of the Martell property?
9   A.  No.
```

This is a startling admission from an experienced investigative reporter, and the fact that the introduction stated as a fact that Ms. Straub-a "perpetrator" was caught on surveillance video in the act of placing dead mice and snakes to commit "home sale

sabotage" makes it plain that these defendants knew, and intentionally disregarded, the very evidence on which the claims were made. Indeed, Mr. Hunter admitted that the only figures on the video that he saw--and incorporated into the broadcast- - was a male and that he never asked Mr. Welsch to show him the video he had of Ms. Straub doing anything with the property. This is fundamentally irresponsible journalism and is the definition of reckless disregard for the truth. Indeed, the only story that would remotely be relevant is how these charges could have been brought, or this caretaker believed, when the very videos on which the claims were based failed to reveal any support for the claims against Ms. Straub.

Mr. Hunter's failures to properly evaluate his source and collect basic evidence before finalizing and causing the story to be broadcast amount to a willful omission of all necessary facts to confirm or refute the claims made by Welsch, the police, or other publications. When asked the most basic question-whether he pressed Welsch to provide him the specific videos that supported the claims-he admitted that he had not.

```
                        22
         22 Q.  Did you ask him to show you videos of
         23      Andrea Straub placing dead mice on the driveway?
         24 A.  Not specifically.
                        23
          1 Q.  Were you aware that that was an
          2      allegation he was making against Andrea Straub?
          3 A.  I was made aware of that by reading the
          4      postings of the press conference. And when we
          5      talked, he reiterated that these things had been
          6      placed in the driveway and he believed it was the
          7      Straubs that had placed them in the driveway.
          8 Q.  You said, Postings of the press
          9      conference, am I correct you did not attend the
         10      press conference that the Lower Merion Police
         11      apparently had related to the Straubs in June of
         12      2013?
         13 A.  That's correct.
         14 Q.  And am I correct that the information
         15      that you received relating to the Straub issue, I
         16      will call it, in the June 2013 time period, came as
         17      an e-mail link to an Ardmore Patch story?
         18 A.  There was no e-mail link. I was handed
         19      a printed out copy of the Patch report by my
         20      assignment editor at about 12:15 on that day. That
         21      was my first knowledge of the story.
```

22 Q. So I am correct that you were reporting
23     on a previously published report of what the police
24     were allegedly doing relating to the Straubs?

24

1 A. Correct.
2 Q. Did you ever obtain a copy of any
3     transcript, audio, video, whatever, of any press
4     conference that the Lower Merion Police may have
5     related to the Straubs during the June 2013 time
6     period?
7 A. No.

…..
19     Eric Welsh had told you that there
20     was something with dead mice and at least a snake
21     when you were chatting with him in the early
22     afternoon on June 26, 2013; is that correct?
23 A. That's correct.
24 Q. Okay. Did he ever show you any video of

25

1 Andrea Straub placing any animals, alive or dead,
2 anywhere?
3 A. I don't recall seeing any video of
4 Andrea Straub placing any dead animals anywhere.
5 Q. Subsequent to June 26, 2013, have you
6 ever seen a video, from any source, of Andrea Straub
7 placing any animals, alive or dead, anywhere within
8 the vicinity of the Martell property?
9 A. No.

26

1 Q. The surveillance video that you viewed,
2 was that selected by Eric Welsh or by you?
3 A. We asked Mr. Welsh to provide what video
4 he could provide to us and the video that we were
5 given is what he provided to us.
6 Q. Was there any timestamps or date stamps
7 on any of the video that Eric Welsh provided to you?
8 A. I really can't recall.
9 Q. With regard to the video that Eric Welsh

10 had shared with you and your cameraman obviously,
11 was there ever any images of Andrea Straub knocking
12 over or compromising in any way any For Sale signs?
13 A. There was video, that I recall, of
14 someone knocking over a sign at the end of the
15 driveway.
16 Q. Did you incorporate that into any of the
17 broadcasts on June 26th or June 27, 2013?
18 A. I think we did.
19 Q. Have you had a chance to review those
20 broadcasts?
21 A. Yes.
22 Q. You told me you were going to do it.
23 A. Yeah.
24 Q. Have you had a chance to review any of

27

1 the June 26th or June 27th broadcasts, say, in the
2 last two weeks or so?
3 A. Yes.
4 Q. Can we agree that the videos that were
5 selected from that which Mr. Welsh shared with you
6 only show a male figure knocking over a sign?
7 MR. SULLIVAN: Object to the form
8 You can answer.
9 THE WITNESS: It was a figure, I
10 think it was a male figure.
11 BY MR. BEASLEY, JR.:
12 Q. Up to the time that you're with Mr.
13 Welsh, and we'll continue with the discussions that
14 you may have had with him, did you ever say to him
15 in words or substance, Mr. Welsh, please show me the
16 videos of Andrea Straub doing what you're accusing
17 her of, something like that?
18 A. I asked him to provide the videos that
19 he was willing to provide to us and the individuals
20 that were provided to police. And he provided the
21 videos that he provided. I made no specific request
22 to see any particular person doing any particular
23 thing.

Mr. Hunter's investigation, in sum, was based upon a very questionable source (Eric Welsch) and was directly contradicted by the exact video that these defendants repeatedly reported in the lead-in and VOSOT material, as a fact, showed Ms. Straub placing dead mice and snakes on the Martell property when the evidence was completely contrary to that claim.

Compounding the recklessness of this broadcast is that Mr. Hunter had another source, a colleague, Lesley Van Arsdall, contradicting the basis of this story. Mr. Hunter was called by Ms. Van Arsdall, a close friend of Ms. Straub, due to Ms. Straub's awareness of this potential story. Mr. Hunter was informed by Ms. Straub that the allegations were false, and Mr. Hunter again admitted that the entire basis for these accusations--the surveillance videos--were of poor quality and did not show Ms. Straub doing anything that the story accused her of:

82

```
 5.  A. She told me that Andrea told her that
 6      the allegations weren't accurate, truthful, whatever
 7      words, I don't remember the exact words. I wanted
 8      to obviously, and had been trying through phone
 9      calls, office visits, and talking to her attorney,
10      reach Andrea so I was grateful to be able to have
11      the opportunity to speak with Andrea at that point.
12      And I was awaiting to hear from her.
13  Q. By the time you get the call from Ms.
14      Van Arsdall, had the five o'clock piece already run?
15  A. Yes.
16  Q. When you got the call from Ms. Van
17      Arsdal where she's providing you --or getting your
18      cell number to provide Andrea Straub--
19  A. (Witness nods.)
20  Q. -- had you seen any video of Ms. Straub
21      placing dead mice or a dead snake on the front lawn
22      of the Martell property?
23  A. I saw shadowy figures. I did not see
24      any video of Mrs. Straub placing any animals on the
```

83

```
 1      driveway.
 2  Q. When you saw the shadowy figures, were
 3      they even on the Martell property?
 4  A. I couldn't determine that.
 5  Q. Would it matter to you whether the
```

```
 6     shadowy figures that were on the video were on a
 7     property other than the Martell property?
 8  A. The video of the person knocking the
 9     sign down was clearly on the Martell property at the
10     end of the driveway. Beyond that, given the
11     property lines being so close, where the figures
12     were at any given moment was really not clear from
13     looking at the video.
```

In his deposition, Mr. May described his role in the news broadcast:

7

```
17  A. An anchor is a person who is considered the
18     anchor of the broadcast. I am placed in a studio. I'm
19     the person who delivers introductions to individual
20     stories. I will toss out to a reporter who may be in a
21     scene or a reporter who may be in a different location in
22     other building. I will handle assignments that are read
23     individually by me rather than by a reporter. My role is
24     basically to be the centerpiece at the newscast.
```

Mr. May stated that he had two conversations with Ms. Van Arsdall in which she told him she knew Ms. Straub.

8

```
 3  Q. Do you have a recollection of how many times
 4     you and Leslie Van Arsdall spoke about Andrea Straub
 5     generally on June 26, 2013?
 6  A. Generally I would say we had two instances
 7     in which we had conversations.
 8  Q. Do you recall approximately when in the time
 9     line of the news broadcast the first discussion happened?
10  A. The first discussion would have occurred
11     shortly after the first story aired which I believe was
12     around 5:07. Leslie's sports cast usually begin around
13     5:20 to 5:25 or did at that time. So between that time
14     period she had come to sit down at the desk and I think
15     that's when I think we had our first discussion and it
16     would have been during a commercial break.
```

11

```
11     …I recall that she brought the fact that the
12     two of them were acquaintances and that she was the
13     subject of this story. That's my recollection.
```

> 14 Q. Did she make any comments about the subject
> 15     of the story generally being that there was this alleged
> 16     home sale sabotage?
> 17 A. I don't recall.

Although Mr. May stated he did not recall the conversation, it should be noted that Ms. Van Arsdall had just gotten off the telephone with Ms. Straub, who maintained the story contained numerous errors and relied on a questionable source.

This story repeatedly ran, because of a desire to obtain a competitive advantage over competing news stations, when the facts on which the claims were directly inconsistent with the assertions. That is unacceptable journalism, known to the CBS defendants, in any context and, as stated above, is reckless, improper, and unjustified. It is completely expected in a situation like this that fallout for the wrongly accused would be devastating. Ms. Straub was terminated from her real estate job at Prudential Fox & Roach as a result of the media. In my opinion, the CBS piece at issue in this lawsuit, and a Philadelphia Daily News article, which followed it by a day (subject of another lawsuit), were directly related to the devastation of Ms. Straub's reputation. That these defendants specifically claimed that they had exclusive video of Ms. Straub (a "perpetrator") in the act of sabotaging a neighbor's home sale is quite different than other news outlets simply reporting what the police allegedly said. The CBS news piece went far beyond any possible legitimate basis and sought "exclusive" status to magnify the claims. The goal of the defendants succeeded and Ms. Straub has been harmed.

To properly analyze the facts and circumstances addressed above, I have applied ethical codes for generally accepted newsroom standards and practices to analyze this material. First, the Society of Professional Journalists' Code of Ethics in its 1996 iteration at the time of the broadcast states, in part, "Make certain that the headlines, news teases, and promotional material, photos, video, audio, graphics, sound bites, and quotations do not misrepresent. They should not oversimplify or highlight incidents out of context."

The Radio and Television Digital News Association states in its Code of Ethics, "Use technological tools with skill and thoughtfulness, avoiding techniques that skew facts, reality or sensationalize events."

In addition to the above selections, a graphic was used during the broadcast of these materials that read, "Home Sale Sabotage" with dollar signs throughout it. The use of the graphic and the description, "home sale sabotage," oversimplified the incidents, mislead the viewers (especially in the context of the copy being read by Mr. May) and took the information out of context. Moreover, the graphic and the verbiage used techniques that skewed facts, reality, and sensationalized events.

In his deposition, Mr. Carns, who wrote the material for the lead-ins, said he spoke with Mr. Hunter, the reporter on the scene who, along with others in the newsroom, approved the lead-ins. On page 27, line 11, Mr. Carns states, "I would have read exactly what was going to air on television to him [Mr. Hunter]."

Mr. Hunter acknowledged in his deposition on page 56 that neither the citation nor the police used the term, "home sale sabotage."

56

```
2  Q.  Where in the citations is there an
3      accusation that Andrea Straub engaged in home sale
4      sabotage?
5  A.  That's not listed in the citation.
6  Q.  Did Officer Pepitone ever use that
7      phrase, home sale sabotage?
8  A.  Not that I recall.
```

Following are further factual errors in the 5 p.m. lead-in in bold under the original:

> Dead mice and a dead snake thrown in the front lawn of a Main Line home, and police say the neighbors, real estate agents, are responsible for it [sic]. Some call it home sale sabotage.
>
> **The only allegations against Ms. Straub came from a house sitter at the residence-an individual whose credibility is in serious question.**
>
> **No dead mice were found. As noted earlier, no authority used the term, "home sale sabotage."**

Eyewitness News obtained exclusive surveillance video of the perpetrators in the act.

> **The surveillance video does not show anyone involved in throwing dead mice and a dead snake; to the contrary, it shows that no rodents were anywhere, and further no females were anywhere in the videos.**

The 6 p.m. lead-in is quite similar to the 5 p.m. lead-in, with the same significant errors of fact. The 11 p.m. lead-in does not have a source for the information. Instead, the accusations are stated as fact, including the description of home sale sabotage.

It is my expert opinion that the defendants violated generally accepted newsroom standards and practices and recklessly disregarded the truth, amounting to malice in the lead-in materials and the graphic.

It should be noted that after reviewing the surveillance video at the request of the plaintiff's attorney, Mr. May made the following analysis:

24

```
10  Q. Can we agree that when you saw this
11      surveillance video that CBS 3 broadcasts an exclusive
```

```
12    there were no dead mice in that video?
13 A. I did not see dead mice in the video.
14 Q. Did you see a dead snake thrown on the front
15    lawn of a Mainline home?
16 A. I did not see that in the video.
```

25

```
14 Q. Was there ever any surveillance video
15    obtained or broadcast by CBS 3 that shows Ms. Straub
16    doing anything with dead mice or a dead snake?
17 A. Not to my knowledge.
```

30

```
 3 Q. So where in the video -- and we can watch it
 4    if you want, do you see anybody remotely looking like
 5    Ms. Straub who is across from me now, doing anything
 6    improper?
 7 A. I don't think there is any claim in that
 8    lead that your client did anything improper. I think
 9    what the story says, what this copy says is that there is
10    a video that shows a perpetrator engaged in behavior that
11    was the focus of this story. In this case knocking down
12    for sale signs that were in this yard and that was the
13    most obvious example in the video.
```

Mr. May, who describes himself as the centerpiece of the newscast as the anchor, was the person who read the erroneous information in the lead-in material for Mr. Hunter's stories. Moreover, Mr. May, who acknowledges he viewed the surveillance video during the original broadcast, failed to raise any substantial questions about the incorrect information about the video.

The reports depended heavily on the statements of Mr. Welsch, who was described as house sitting for the owner of the home. Moreover, his comments also provided the basis for a citation being given to Ms. Straub.

At page 37 of his deposition, Mr. May acknowledged that Mr. Welsch was the only source for the information broadcast in this story:

```
12    Q.   Are you aware of whether there are any other
13         sources accusing the Straubs of placing dead animals to
14         sabotage the home sale other than Mr. Welsch?
15    A.   I am not aware of that, no.
16    Q.   Would you have expected, based upon what we
17         talked about earlier, that who everybody put the story
18         together would have had more than one source for the
19         story?
20    A.   That would be typical, yes.
```

Indeed, two sources is the generally accepted standard as a minimum that a reasonable journalist would use before broadcasting such a story. Mr. May, at page 17, described why:

```
1    Q.   I might write from time to time, forgive me,
2         I'm not trying to be rude.  I've seen video of you in the
3         past where you've stated that you rely on two sources for
4         your stories or a minimum of two sources.  Would that be
5         an accurate statement?
6         MR. SULLIVAN:  Object to the form.
7         MR. BEASLEY:  You can answer.
8         THE WITNESS:  My practice as a reporter?
9         MR. BEASLEY:  Yes, sir.
10        THE WITNESS:  I would say that's accurate.
11        BY MR. BEASLEY:
12   Q.   Why would two sources be important in terms
13        of preparing a report broadcasting a story?
14   A.   I think that as a rule the more reliable
15        sources that you have providing information the more
16        likely you are to get a story right.
```

The RTDNA's "Guidelines for Evaluating Sources" provide a list of questions that *every* reporter should ask about the use of sources to conform to generally accepted newsroom standards and practices. Following are some of those questions:

--What is the past reliability and reputation of this source?
--What is the source's motive for providing the information? What does this source have to gain or lose? Will this information make the source look better, worse, guilty or innocent?
--Am I being manipulated by this source?

The Society of Professional Journalists' Code of Ethics states, "The public is entitled to as much information as possible on sources' reliability."

It is my expert opinion that Mr. Hunter and the CBS staff failed to ask these key questions and abide by these generally accepted newsroom standards and practices. A quick Web search for Mr. Welsch would have found what I did: The source's reputation and reliability are highly questionable to a reasonable person, and the CBS defendants failed to investigate in any way the legitimacy of this source and to provide such information to the public.

Once CBS was aware that this broadcast had serious credibility questions, from the time that Mr. Carns stated his concerns to when Ms. Van Arsdall informed Mr. Hunter and presumably Mr. May about Ms. Straub's discussions with her, CBS was under an obligation to stop airing the story and to issue some form of correction. Rather, the news organization repeatedly ran the story in an attempt to gain a competitive advantage over its competitors, at the expense of Ms. Straub's reputation and career. That is irresponsible journalism and well beyond simple neglect.

Therefore, it is my expert opinion that CBS and its employees involved in the preparation and broadcasting of the June 26 and 27, 2013 Straub pieces violated generally accepted newsroom standards and practices.

CBS and the defendants failed to abide by generally accepted newsroom standard and practice as outlined in the SPJ code, where it states, "Balance a criminal suspect's fair trial rights with the public's right to know."

Mr. Hunter's reports stated that Ms. Straub and her husband Jonathan received citations from the police. The reports on the 5 p.m. and 6 p.m. broadcasts state the following:

> Welsch showed his videos to police, and they issued citations to Jonathan and Andrea Straub.... These identical citations for harassment and disorderly contact accuse the two realtors with annoyance by creating a physically offensive condition, which serves no legitimate purpose. While the citation does not specifically accuse the Straubs of leaving the mice, the snake and knocking down the signs, they are fined $446 each.

A longtime reporter such as Mr. Hunter and his supervisors at CBS know that a citation may not be the final adjudication of the incident in question. Ms. Straub challenged her citation, which was dropped in a court of law. Mr. Hunter fails to provide the proper context for the accusation that it was a charge, with an opportunity to challenge the allegations—an opportunity Ms. Straub used successfully. Therefore, it is my expert opinion that Mr. Hunter and the other defendants did not abide by generally accepted newsroom standards and practices by failing to acknowledge that Ms. Straub could contest the citation.

It is important here to note the information Mr. Hunter and CBS had that should have created significant caution about the reports. As Ms. Van Arsdall, a CBS employee and a friend of Ms. Straub, noted in her deposition, the plaintiff contacted her about errors in the story. Ms. Van Arsdall then contacted Mr. Hunter in the field. After that, Ms. Straub and Mr. Hunter spoke on the telephone.

On page 101 of his deposition, Mr. Hunter described the conversation before the 6 p.m. broadcast:

101

```
 6 Q. Tell us about that discussion if you
 7    could, and about when that was?
 8 A. Yes. Approximately, ten minutes to six,
 9    she called. I identified myself. She identified
10    herself. She explained that she was extremely
11    upset; that the story was wrong, the allegations
12    were wrong. She referred to Mr. Welsh at one point
13    as a producer of zombie movies and a sex offender.
```

Although this conversation, according to Mr. Hunter, was off the record, the information can be used for planning purposes, such as stopping a story from being broadcast. Mr. Hunter and John Wilson, the assistant news director, chose not to do that and the story was shown.

By ignoring critical information about the key source for the information, the defendants recklessly disregarded the truth amounting to malice.

Mr. Hunter claimed on page 31 of his deposition that the stories were accurate and truthful. It is my expert opinion that these stories were far from accurate and truthful. As noted in this report, the stories contained numerous errors of fact. Furthermore, the defendants failed to act upon critical information about the main source of the story and the citation, resulting in reckless disregard of the truth amounting to malice.

It is also my expert opinion that Mr. Hunter's dependence on the police citation fails to reach the standard for "fair report" privilege because the police citation does not specifically note the claims made in the broadcasts that Ms. Straub engaged in "home sale sabotage" by tossing mice and a snake into the Martell property. Moreover, the videos do not show Ms. Straub engaged in any such activities.

The Pennsylvania Defamation Statute [See 42 Pa. Cons. Stat. 8321-8345, especially 8343] states, in part, "A report is fair and accurate if it is 'substantially accurate.' A plaintiff may overcome the fair report privilege by showing that the defendant acted with actual malice. It is my expert opinion that Mr. Hunter and CBS's broadcasts are far from substantially accurate, reaching reckless disregard of the truth amounting to malice. As a result, it is my expert opinion that these broadcasts fail to reach the standards of fair report.

The SPJ and RTDNA codes state that a news organization should correct its errors—a request made by Ms. Straub's attorneys—that the defendants ailed to do. The SPJ code states, "[Journalists should] admit mistakes and correct them promptly." The RTDNA code states, "[Journalists should] investigate complaints and correct errors promptly and with as much prominence as the original report."

It is my expert opinion that CBS and the other defendants failed to adequately investigate the reports and did not correct the errors. The only material dealing with the dismissal of the charges against Ms. Straub occurred in brief reports on December 11, 2013, which lacked the significant prominence of the original reports and failed to acknowledge the defendants' errors.

Therefore, it is my expert opinion that these reports, individually and collectively, were defamatory. Furthermore, it is my expert opinion that these broadcast stories collectively showed a reckless disregard for the truth such that they demonstrated malice by the defendants. I hold all of the above opinions to a reasonable degree of professional certainty

*Christopher Harper*

Christopher Harper
Professor
School of Media and Communication
Department of Journalism
Temple University
2020 N. 13th Street
Philadelphia, PA 19122